204 N.J. Super. 469 (1985)
499 A.2d 264
STATE OF NEW JERSEY, PLAINTIFF,
v.
RONALD EUGENE LONG, DEFENDANT.
Superior Court of New Jersey, Law Division (Criminal), Atlantic County.
January 7, 1985.
*471 James P. McClain, Assistant Prosecutor, for plaintiff (Joseph A. Fusco, Prosecutor of Atlantic County, attorney).
David Kairys of the Pennsylvania Bar admitted pro hoc vice, Robert Moran, Deputy Public Defender and Barry Cooper, Assistant Deputy Public Defender, for defendant (Joseph H. Rodriguez, Public Defender, attorney).
*472 PORRECA, J.S.C.

I.

PROCEDURAL HISTORY
The Atlantic County grand jury indicted defendant Ronald E. Long for murder, armed robbery and related weapons offenses. The State seeks the death penalty. Defendant Long filed a motion challenging the constitutionality of the array of both the grand and petit juries. The court ordered:
(1) an evidentiary hearing, and stayed the trial pending the outcome of the jury challenge. A flurry of similar motions ensued on behalf of other defendants, including some charged with capital murder. The court then:
(2) consolidated all motions in all cases with the Long challenge;
(3) stayed the trials in all cases in which such motions were made;
(4) specifically allowed the Long grand jury challenge to proceed even though out of time;
(5) did not decide whether the challenge to the petit jury was out of time;
(6) barred the dismissal of any challenge motion in any of the cases on the ground that the motion was made out of time.
The State moved for leave to file an interlocutory appeal. The Appellate Division granted the application and heard the appeal, but permitted the trial court to proceed similtaneously with the evidentiary hearing. The Appellate Division rendered its opinion on December 20, 1984. In the interim, the evidentiary hearing below proceeded and final oral arguments in the trial court were scheduled for December 21, 1984.
The Appellate Division affirmed the trial court's order:
(1) granting discovery, an evidentiary hearing, and the stay of the Long trial;
*473 (2) consolidating all challenge motions;
(3) staying the consolidated cases;
(4) and (5) permitting the defendant to attack the composition of the grand and petit jury array out of time;
(6) the Appellate Division reversed the order that barred dismissal of any other challenge to the array because it was made out of time. This last decision left open the trial court's ability to determine, case-by-case, whether dismissal based on timeliness is appropriate.
The challenge to the array began alleging constitutional infirmity by virtue of systematic exclusion of a cognizable class. During preparation for the evidentiary hearing, the defense detected a potential violation of the statutes governing the jury process. Unusual patterns in the names of persons selected to serve surfaced creating suspicion that the selection process did not conform to the statutory mandate. Strategies were adjusted, and the suspected vulnerable link became the focus of the assault.
The attack was simple, direct and to the point. The statutory scheme, letter and spirit, require a random selection of jurors resulting in jury lists that represent a true cross section of the community. Defendant asserts that: (1) random, in the juror selection context, means that all persons have an equal chance to be selected; and (2) the system employed in Atlantic County is not random and, therefore, in violation of the statutes.
He further asserts that the selection process is mandatory and therefore he need not demonstrate prejudice or any additional constitutionally defective consequence to invalidate the process by which jurors are chosen as well as the actions of juries constituted by the process. Therefore he need not demonstrate prejudice, or prove a constitutionally defective consequence to prevail. The relief sought is twofold: (1) the dismissal of the indictment, and (2) the invalidation of the juror selection procedure used by the Atlantic County Jury Commission. *474 Relying on that stance, defendant did not present any evidence designed to show exclusion of a cognizable class.
An understanding of the issues thus raised requires a detailed discussion of the juror selection process presently employed.

II.

STATEMENT OF FACTS

A. Compilation of the "Source List."

Once a year, the Atlantic County Data Processing Department receives a magnetic computer tape on which are listed all the licensed drivers who reside within the county and another magnetic computer tape on which are listed all those persons who reside within the county who are registered to vote. These tapes are then run through a "match-merge" program to produce a source list, that is, a magnetic computer disc on which are listed, hopefully once, alphabetically, each person who resides within the county who is either a licensed driver or a registered voter or both.
The Atlantic County source list contains approximately 180,000 names. According to the 1980 census, there are 130,000 people in Atlantic County between the ages of 18 and 74.

B. Compilation of the "Master List."

The clerk to the jury commission calculates how many jurors, both grand and petit, will be required during the upcoming session. The jury commission clerk divides that number into the total number of names contained on the source list to derive the "interval number" for the compilation of the "master list" of persons to whom juror questionnaires will be sent.
The jury manager calculates how many persons should be sent juror questionnaires by examining past "yields," that is, the percentage of those called or queried who are not exempt, excused or disqualified. The accepted rule of thumb in Atlantic *475 County is that the number of persons to whom questionnaires should be sent is four-times larger than the number of persons required to serve.
The jury commission clerk advises the data processing department of the number of questionnaires to be sent and the interval number.
At the data processing department, the computer uses the interval number to make selections from the source list. The same number is used as the starting number. Succeeding selections are made at those positions which are equal to twice the interval number, three times the interval number, etc., until one complete run through the source list has been accomplished.
If the initial run through the source list does not yield a sufficient number of names, succeeding runs through the source list are made until a sufficient number of names has been compiled. In succeeding runs through the source list, the computer adds a different constant to the interval number and the first selection for that run is made at that position. Succeeding selections are made by adding twice the interval number, three times the interval number, etc., to the position at which the first selection for that run was made.
The added constant for a second run through the source list is 39; for a third run, 41; for a fourth run, 43; and for a fifth run, 49.
To illustrate the process described above, assume that the source list contains 180,000 names and that 3,000 jurors are required. The starting and interval number for the compilation of the master list would be calculated by the equation 180,000/3,000 = 60. The number of questionnaires to be sent is determined by the equation, 4 (each 4 questionnaires yields 1 juror) X 3,000 (the number of jurors needed) and would therefore be 12,000. In this hypothetical situation, the number 60, as the starting and interval number, and the number 12,000, as the number of names to be selected, would be sent to the county data processing department.
*476 At the data processing department, the computer would make selections from the 180,000 name source list in the following manner until 12,000 selections were made:
First run: positions 60, 120, 180, 240, 300, 360, 420, etc.

Second run: positions 99, 159, 219, 279, 339, 399, etc.

Third run: positions 101, 161, 221, 281, 341, 401, etc.

Fourth run: positions 103, 163, 223, 283, 343, 403, etc.

Fifth run: positions 109, 169, 229, 289, 349, 409, etc.

As the computer proceeds through the list, it "tags" each position at which it makes a selection. If the computer lands at a "tagged" position on the list during a run, it will make the selection from the first following position from which a selection has not been made.
Once the 12,000 names are selected from the source list, a computer printout is prepared and sent to the clerk of the jury commission.
This master list is alphabetical by the first letter of the last name.
Upon receiving the master list from the county data processing department, the clerk to the jury commission "scrubs" it by manually removing duplicate names, unintelligible names or names paired with incomplete addresses.
The clerk to the jury commission mails a juror questionnaire to each person whose name and address appears on the "scrubbed" master list.

C. Compilation of the Grand and Petit Jury "Pools."

Upon receiving completed juror questionnaires, the clerk to the jury commission manually examines them to determine whether the person who completed the questionnaire is exempt from jury service pursuant to either N.J.S.A. 2A:69-1 or -3. However, ineligibility because of recent service is checked only for the preceding four months. A juror who has served during the preceding year is ineligible for service. N.J.S.A. 2A:69-4.
Those questionnaires completed by persons who are eligible to serve as jurors are retained by the clerk to the jury commission *477 and placed in alphabetical order by first letter of the last name. These questionnaires are referred to as "qualified questionnaires."
The boxes containing the qualified questionnaires are presented to the jury commissioners, and the clerk advises the commissioners of the grand jury starting and interval number to be used. The clerk determines this interval number by dividing the total number of jurors required for that session by the number of grand jurors required for that session. The jury commissioners then manually proceed through the qualified questionnaires and select those questionnaires at the interval number, twice the interval number, three times the interval number, etc., until a number of questionnaires equal to the number of grand jurors required for that session have been selected.
The qualified questionnaires selected in this matter constitute the grand jury "pool," while the remaining qualified questionnaires constitute the petit jury "pool." The clerk to the jury commission records the commissioners' selections on the printout of the master list and sends the marked master list to the county data processing department.

D. Assignment of Persons in the Qualified Pools to Grand and Petit Jury Panels.

Using the marked master list the county data processing department designates on magnetic computer disc, those persons for the grand jury qualified pool and those persons for the petit jury qualified pool. At this point the names of the persons in each pool are "listed" on the magnetic disc in alphabetical order by first letter of the last name.
Prior to the day upon which the selections for the various grand and petit jury panels are to be made, the assignment judge issues a jury order for the upcoming court session. On selection day, the assignment judge, or his designee, appears at the county data processing department to make the selections. Prior to the selections being made, the "lists" of persons in the *478 grand and petit jury qualified pools, which are contained on magnetic computer disc, are run through a computer program. This computer program re-orders the names in the two qualified pools according to a predetermined formula. After being run through this computer program, the "lists" of persons in the two qualified pools are no longer alphabetical by first letter of the last name; the lists are arranged alphabetically by the fifth letter of the last name, the fourth character of the address and the second character of the driver's license number.
Once the two "lists" are re-alphabetized according to the fifth letter alphabetization formula described above, the selection process for the particular grand and petit jury panels begins. The assignment judge or his designee is asked by data processing to pick a number for each grand and petit panel referred to in the jury order. If the jury order requires fifty grand and petit jury panels to be compiled, fifty numbers are selected.
The computer uses the number provided by the judge as the starting and interval number to make its selections. Thus the needed jury panels are created.

III.

CONTENTIONS OF THE PARTIES
Superficially, the process appears impartial and random in that it is unintentional, is not designed to include or exclude any cognizable class and is both blind and benign.
However, defendant contends that the statutes call for a random process that gives every person an equal chance to serve, that spreads the responsibility of juror service across as broad a spectrum as possible and provides the court with a fair cross-section of the community from which to select juries. He further contends that since that is the statutory mandate, a deviation from it is fatal without proof of prejudice or further constitutional defect.
In support of his position he submits the following analysis of the Atlantic County juror selection process:

*479 A. The Source List.

Because there are only 130,000 potential jurors in Atlantic County, a source list of 180,000 must contain 50,000 duplications. Therefore, 40% of the potential jurors have twice the probability or chance of being selected as others, thereby violating the precept that all persons should have an equal chance of being selected.

B. The Master List.

The interval number for compilation of the master list is incorrectly calculated in that, instead of dividing the number of names on the source list by the number of people to whom questionnaires are sent, the source list is divided by the number of people needed for the jury. The result is an interval four-times larger than it should be, which in turn means that several runs through the list are necessary. Ideally, one run through the list is all that should be required. The effect of this error will be seen below.
The starting number is not randomly selected but is rather set at the calculated interval number.
A constant is used for succeeding runs through the list and the constants are very close to one another. The result is that certain parts of the list are drawn from heavily and others not touched, which in turn results in people with the same last names and addresses (members of the same family) being frequently selected for service on the same panel.[1]

C. The Selection of Panels.

The sorting of the master list by utilization of the fifth letter alphabetization system is peculiar to Atlantic County and again *480 results in a homogeneity that tends to skew the panel against a true cross section of the community.
The selection of a number by a judge to be used as both the starting number and the interval number is at variance with any accepted random selection process and ignores the maxims of the discipline.[2] The result is to favor certain portions of the list and ignore others and in some instances effectively excludes 90% of the people on each selection.[3]
The State contends that the statute only requires an impartial process, that is, one that does not by design include or exclude any cognizable group and that furthermore the statute is directory, not mandatory.
The State further asserts that without proof of the exclusion of a cognizable class or a demonstration of prejudice, defendant cannot prevail.

IV.

THE PROOFS
Defendant presented the testimony of those county personnel directly involved with the selection process and centered about *481 a careful exposition of the design and implementation of the Atlantic County procedure. That evidence set the stage for the testimony and opinions of Professor Joseph B. Kadane,[3a] who then analyzed the effect of the system on the composition of the panel, expounded on the meaning of random and the ease of implementing a truly random selection process. The Petit Juror Manual by the administrative office of the courts (AOC) and the 1980 United States census were introduced and defendant rested. The State called a representative of the AOC to discuss the force and effect of the Petit Juror Manual.

V.

ISSUES
A. What is the time period within which motions challenging the petit jury array must be filed?
B. What does the statute require of a mechanical juror selection process? N.J.S.A. 2A:71-3.1.
C. Does the Atlantic County process comply with the statutory requirements?
D. If the challenge to the array is successful, should its effect be retroactive, partially retroactive, or prospective only?

VI.

THE LAW

A. A Challenge to the Array of Petit Jury Must Be Brought Within 30 Days of Plea. R. 1:8-3(b); R. 3:6-2; R. 3:10-1, et seq.

In the case of Ronald E. Long the challenge to the petit and grand jury array was allowed out of time. In the consolidated cases the motions to the grand jury array were filed out of time *482 in every case but one.[4] The State made a motion to dismiss each untimely challenge. The presiding judge summarily barred a consideration of those dismissal motions.[5] The Appellate Division reversed that action. If necessary, those motions to dismiss the challenge motions may now be heard by each judge to whom those indictments have been assigned for disposition and decided on a case-by-case basis. Since the time frame of R. 1:8-3 has not been previously defined and was left open by the Appellate Division in its opinion in the interlocutory appeal, the issue needs to be decided now.
R. 3:6-2 seems quite clear in that it places a 30-day-from-date-of-plea limit on a challenge to the grand jury array. R. 1:8-3 is silent as to when a party may challenge the petit jury array and simply says that such a challenge "shall be decided before any individual juror is examined." Emphasis supplied. The orderly administration of justice demands some time limit. This court finds compelling the State's argument that such a challenge must be made within 30 days of entry of the original plea absent a showing of good cause. R. 1:8-3, R. 3:6-2 and R. 3:10-5 must be read in pari materia. R. 3:10-1, R. 3:10-2 and R. 3:10-5 all come into play. R. 3:10-1 states that:
[a]ny defense or objection capable of determination without trial ... may be raised before trial....
R. 3:10-2 provides that:
defenses and objections based on defects in the institution of the prosecution or in the indictment .. . must be made by motion before trial....
R. 3:10-5 states that all
motion[s] made pursuant to R. 3:10 which [are] required or permitted to be made before trial shall be made within 31 days of the initial plea to the charge, but the court may for good cause shown enlarge the time thereafter.
*483 A motion attacking the petit jury array constitutes a defense or objection capable of determination without trial and, therefore, should be made within 30 days of the initial plea. If the perceived defect in the array was neither discovered nor discoverable within 30 days of entry of the plea, defendant is still protected since the court may enlarge the time for good cause shown. State v. Long, 198 N.J. Super. 32 (App.Div. 1984), and cases cited therein.

B. The Statutory[6], Case Law and Administrative Scheme[7]for Juror Selection Mandates a Procedure That Creates a Pool of Jurors Representative of the Community, Each of Whom Has an Equal Chance of Selection.

It is vital that juries be selected in a manner wholly free from taint and suspicion. Proper jury selection is an integral part of the judicial process to which every criminal defendant has a fundamental right. State v. Wagner, 180 N.J. Super. 564 (App.Div. 1981). It goes to the heart of a fair and impartial trial and transcends even the accused's personal interest in a just trial. It fulfills society's concern in a rational course of justice precluding arbitrary action and deprivation of life or liberty save by due process of law. In capital cases this responsibility is of the deepest concern possible and may be said to be imbedded in the natural law. State v. Kociolek, 23 N.J. 400 (1957).
N.J.S.A. 2A:71-3 in minute detail, step-by-step, instructs us how to select jurors. A shorthand term for the method defined is "pure random." In any "random" system all those participating *484 have an equal chance of selection. Since this provision is designed to secure a fair and impartial jury, it must be deemed mandatory. State v. Kociolek, supra at 408.
N.J.S.A. 2A:71-3.1 enacted in 1958 was occasioned by the advent of data processing. It was not an effort to dilute the "pure random" process of section 3. It was an effort to permit jury commissioners to take advantage of modern technology. It could not be as specific and detailed as section 3 which defined the manual system because the means of implementation were infinitely varied. To dispel any question that this was the intent of the Legislature, one need only read the "statement" attached to the amendment.
The Legislature has authorized ... the use of electro-mechanical devices ... in the preparation of jury lists. To further the efficiency and time saving effort, plus clerical expenses of typing, this bill is proposed as an alternative method to the use of the metal or plastic disc system of drawing the grand and petit juries.... This proposed method is an efficient, modern, time and money saving improvement....
The reason for not being specific as to the mechanical methodology is equally clear from the last sentence of the "statement":
It is, of course, optional with the boards of chosen freeholders to provide for the machines and cards.
To come to a conclusion that manually selected jurors must be selected randomly but mechanically selected jurors may be selected in a non-random way flies in the face of reason, logic and a uniform system of justice that provides equal protection to all those people who come under its sway. U.S. Const., Amend. XIV; N.J. Const. (1947) Art. I, par. 1.
To say that selection must be "random," that is, that each person has an equal chance of selection is only half a definition. Given only that half of the definition, the jury commission could create its jury pools by assigning each municipality in the county a number, placing those numbers on uniform plastic pieces in a box, drawing therefrom one piece and then randomly selecting names from that municipality. Such a method would be a "pure random" method but it would not produce a fair *485 cross-section of the community nor would it spread evenly across the eligible populace the burden, obligation, duty and privilege of jury service. These requirements are engraved in stone in our system of jurisprudence. State v. Rochester, 54 N.J. 85 (1969); Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).
Therefore, the mandate is that the system produce a pool of jurors that truly reflect community standards[8] and in which all have an equal chance of serving.

C. The Atlantic County Juror Selection Process Does Not Comply With the Statutory Mandate.

The selection process is presumed valid and the burden of proof is on the moving party. So. Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 92 N.J. 158, 305 (1983); In re D.J.M. 158 N.J. Super. 497 (1978). He must show by a preponderance of the believable evidence that the attacked process is fatally flawed. This defendant has done. The cumulative effect of the defects in the complicated and cumbersome procedure employed in Atlantic County in providing jurors to the courts renders the process decidedly non-random.[9] While it has not been proven that any cognizable class has been excluded or that defendant has suffered any prejudice because of the statutory violation, it is well settled that none need be shown for relief to be granted. State v. Kociolek, supra 23 N.J. at 409; *486 State v. Wagner, supra 180 N.J. Super. at 567; cf. State v. Porro, 152 N.J. Super. 259 (App.Div. 1977), cert. den. 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978).
The addition of the driver license list to the voter registration list improved the reach of the jury commission in its effort to provide juries which truly reflect community standards. N.J.S.A. 2A:70-4. However, a "random" system demands a minimization of the duplication of names on that list. Every person whose name appears more than once on the source list has a greater chance of selection than a person whose name appears once. To that extent the randomness of the process is polluted. Perfection may not be attainable but its pursuit should be relentless. The proofs are scant in this area in that the census is four-years old, Atlantic County is in the throes of rapid development and nearly revolutionary change, and not all persons between 18 and 74 are drivers or registered to vote. The problems with the form, duplicitous content and completeness of the mandated driver's license and voter registration lists and the potential for a thorough and clean match-merge were not strenuously contested and therefore not thoroughly explored. Suffice to say that facially there is intolerable duplication. To the extent that it can be practically reduced, it should be and forthwith.
There are established accepted maxims for the calculation of intervals and similarly proven means for random selection of starting numbers. The Petit Juror Manual thoroughly but succinctly outlines and explains these principles and even includes a random number table. There is gross deviation from these principles in the Atlantic County process. The deviation is not purposeful nor ill-intentioned, but it is nonetheless real and substantial. The cumulative effect is a violation of the mandatory provisions of the jury selection statutes calling for "random" selection of jurors.

*487 D. The Successful Challenge to the Grand Jury Array Has Prospective Application Only.

To afford anything other than prospective application to this decision would create chaos, wreak havoc and cause pandemonium in the criminal justice system. It would result in glaring inconsistencies and disparate treatment of defendants.[10] For example, should capital cases be treated differently from non-capital cases?
Should Ronald Long's indictment be dismissed, but others not dismissed even though the ground for dismissal is the same? If the rule is applied only to those who in the future make timely application, then every indictment handed up in the last 45 days is subject to dismissal, but those indicted perhaps by the very same grand jury who have had their case disposed of or have entered their plea more than 30 days ago have no recourse. Do we let the bar down completely for all except those whose cases have been fully litigated including the appellate process?
The mutations are endless and defy rational, consistent resolution if any application other than prospective is granted. No more presentations could be made to a grand jury until a "random" selection procedure is developed and implemented. What will the effect be on the state grand jury that draws its members in part from Atlantic County? The prognosis for the criminal justice system stricken with retroactivity is total paralysis.
The courts have run the gamut in these situations and the approach to retroactivity in a given case is not answered by any constitutional mandate. Rather the competing considerations *488 in each case are weighed. State v. Nash, 64 N.J. 464 (1974). There are basically three factors to be considered: (1) the purpose of the rule and whether it would be furthered by retroactive application; (2) the degree of reliance placed on the old rule by those who administered it; and (3) the effect retroactive application would have on the administration of justice.
The last has already been examined. The effect on the administration of justice would be disastrous. Secondly, those administering the juror selection process were certainly making their best effort to select jurors, from the lists mandated by the Legislature, in an unbiased and all-inclusive manner. The shortcoming here does not represent an invidious discrimination based on race, color, creed, national origin, ancestry, matrimonial status or sex. State v. Porro, supra. They simply did not go behind the facially random, that is, unintentional, blind, purposeless or haphazard way in which the computer selection was initiated. Their sincere belief was that the process did not discriminate, did spread the burden across the community and did fulfill the requirements of the law. It is only now, that "random" has been defined with new dimension, and the process used in its pursuit disected and microscopicly examined, that the lack of "randomness" is known and understood. Lastly, no purpose would be served by dismissing indictments and forcing the prosecutor and perhaps the attorney general to recall hundreds of witnesses and victims for the usually routine formality of a "true bill" vote. A court's power to dismiss an indictment is not to be exercised except on the clearest and plainest grounds. State v. Porro, supra 152 N.J. Super. at 281. The court recognizes that it is unusual to find criminal cases operating prospectively only. James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961). However, this is an unusual situation that calls for unusual treatment. Every criminal case in the county is affected, not just those with particular fact patterns or selected offenses such as were found in landmark decisions like Miranda v. Arizona, 384 U.S. 436, *489 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); U.S. v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); State v. Johnson, 43 N.J. 572 (1965), aff'd 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); and Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). The purpose of this ruling is to give legal definition to "random" and to insure future compliance with the law by the Atlantic County Jury Commission. The court has no doubt that this has been accomplished. It is not necessary to dismiss any indictments to reinforce that implementation. The grand jury presently impaneled may sit and those indicted by it and all its predecessors may not take advantage of this decision.

VII.

The Successful Challenge to the Petit Jury Array has Prospective Application Only.
The principles of State v. Nash, supra, govern this aspect of the challenge as well. Even though retroactivity will not cause the same inconsistencies and disparate results endemic to grand jury retroactivity, the detrimental consequences are substantial.[11]
Even if retroactivity were limited to cases tried in the future by juries selected in the past by the invalid process, the delay would be devastating. It is true that defendants in non-capital cases may waive a trial by jury, R. 1:8-1(a) and, therefore, impliedly may waive any defect in that jury. State v. Kociolek, supra. However, to leave the trial courts at the mercy of defendant's election while new jury lists were being prepared, *490 questionnaires mailed and a new computer program designed is untenable.
This court was left with unavoidable conclusions. The system did not rise to the task of providing juries that were representative of a fair cross section of the community in which all had an equal chance of selection. The nullification of past and existing juries would collapse the criminal justice system in Atlantic County.
The sensible test of weighing competing considerations so succinctly and clearly set forth in State v. Nash, supra, provides the court with a viable solution to this perplexing problem amply supported by the law of the land. Trials may proceed while the jury commission moves with alacrity to comply with the mandate of the law. No new jury lists may be prepared under the existing non-random system.
NOTES
[1] For example, the November 1983 panel had a total of 110 jurors of which two, Morris and Freida Cohen, live at the same address. This is a frequent occurrence even though in a "random" system the odds of it occurring even once are infinitesimal. Overall out of a total of 4,366 qualified jurors there are 146 pairs or 292 people with another family member on the list. In addition, there are two triples and one quadruple (four people in the same session from one family).
[2] The starting numbers set in the jury orders are less than ten in every available instance. When asked to pick the number used for panel selection, 42 times out of 54 the judge picked a number less than 10 when the range is 1 to 99. Professor Kadane testified that this method is "notoriously unreliable" if the goal is a random process.
[3] Panel no. 47 November 1983 includes an inordinate number of persons with apparently Jewish names. Panel no. 2 November 1983 includes 19 of 65 names with apparently Italian names. Panel no. 45 November 1983 had 11 jurors (10% of the panel) with the last name "Williams." The jury clerk perceived a serious problem of questionnaires being mailed to the same people and she related it to the interval designation.
[3a] Professor Kadane is the head of the Department of Statistics at Carnegie-Mellon University and has a B.A. cum laude in mathematics from Harvard University and a Ph.D. in statistics from Stanford University and is the author of Random Juror Selection from Multiple Lists and Jury Representativeness.
[4] State v. Vincent Brown, Ind. # XXXX-X-XXC, not guilty plea entered June 18, 1984, motion filed July 9, 1984.
[5] Until a determination was made as to the viability of the substantive challenge, it seemed judicially economical to avoid a plethora of "good cause" hearings; and in the absence of stare decisis on the subject, the potential of a different interpretation of the time requirements of R. 1:8-3(b) by each trial judge.
[6] While this discussion focuses on N.J.S.A. 2A:71-3 and -3.1, all juror and jury related statutes need to be examined to grasp the permeating thread of thought. N.J.S.A. 2A:68-1 through:72-8; N.J.S.A. 2A:74-1 through:80-3 and the rules of court R. 1:8-1 through -5.
[7] Petit Juror Manual prepared and distributed by the administrative office of the courts July 6, 1982; report of the jury utilization and management task force appointed by Chief Justice Wilentz, chaired by Justice Robert L. Clifford (December 14, 1982).
[8] N.J.S.A. 2A:70-4 directs the use of driver's license and voter's registration lists and the committee statement tells us why:

Juries chosen from a representative community sample are a fundamental component in our system of justice. However, the limitations on sources which jury commissioners may use has ... greatly hampered the justice system's ability to get juries which truly reflect community standards.
[9] Random when used hereinafter means: a system which provides pools of jurors that comprise a representative cross section of the community selected in a manner that gives each person an equal chance to be selected, and which spreads the burden of service evenly among the eligible populace.
[10] Grand juries drawn by this system newly declared invalid have: (a) indicted defendants who have pled or been tried, sentenced, exhausted appeals and others at every stage of legal process in between; (b) indicted defendants who are pending trial; (c) been impaneled to hear new presentations; (d) supplied jurors to state grand juries.
[11] Petit jury panels drawn by a system newly declared invalid have: (a) convicted defendants who are awaiting sentence, been sentenced, exhausted appeals and others at every stage in between; (b) been impaneled to try pending cases. Note must be made also that questionnaires are out, master lists have been prepared and the selection process under the invalid system is ongoing.