SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Wildemar A. Dangcil (A-56-20) (085665)**

**Argued June 29, 2021-- Decided August 16, 2021**

**SOLOMON, J., writing for the Court.**

The Court considers defendant Wildemar A. Dangcil's contentions that the hybrid jury-selection process implemented by the Judiciary in response to the COVID-19 pandemic (1) deprived him of his rights to presence and representation and (2) failed to ensure him a jury drawn from a representative cross-section of the community.

Jury selection for defendant's trial was scheduled for April 20, 2020, but was adjourned in light of the pandemic. On July 22, 2020, in coordination with representatives from the Attorney General's Office, Office of the Public Defender, County Prosecutors Association of New Jersey, and New Jersey State Bar Association, the Court established a plan to resume criminal and civil jury selections using a hybrid process intended to maintain the core components of pre-pandemic jury operations modified to protect the health and safety of jurors, attorneys, parties, and all court users.

Under the predominately virtual selection process, jurors were to be summoned consistent with pre-pandemic practices, except that they were to receive a summons notice informing them of both the virtual jury-selection process and socially distanced trials. Prospective jurors also received a COVID-19 questionnaire. Court administration and assignment judges were tasked with prescreening jurors for technological access and knowledge, and with providing devices and broadband access as necessary. Judiciary staff prescreened jurors for trial availability, medical inability, and other considerations consistent with pre-pandemic protocols. All case-specific questioning was conducted during virtual voir dire before a judge, counsel, and the parties. Following virtual voir dire, a fraction of prospective jurors reported in person to courts for the final phase of selection with facemask and social-distancing precautions observed.

New Jersey's first jury trial under the plan was set to begin in Bergen County on September 21, 2020, and defendant's was selected as the first trial to be conducted. During pretrial conferences, defense counsel advised that defendant intended to challenge the hybrid jury-selection process, but no such challenge was filed. On the morning of September 21 -- after thirteen prospective jurors were interviewed over the course of two hours -- defense counsel filed a challenge of the array.

1

Brian McLaughlin, manager of jury programs for the Administrative Office of the Courts (AOC), attested that the same Jury Management System used to generate jury pools and send out summonses and questionnaires pre-pandemic was used in the hybrid process, with the exception of added COVID-19 related materials and the temporary disablement of the juror self-deferral option. As they did pre-pandemic, jury managers addressed requests for disqualification, excusals, and deferrals in a standardized pre-screening process that did not include trial-specific information. Also consistent with pre-pandemic practices, juror demographic information including race, ethnicity, and gender was not collected.

Regarding defendant's case, Lourdes Figueroa, jury manager for the Bergen County Vicinage, certified that 800 jurors were summoned. Of that list, 197 did not respond, 70 summonses were returned as "undeliverable," 178 prospective jurors did not qualify for service under statute, 90 were excused based on statutory factors, and 58 were deferred due to calendar conflicts; in the end, 207 potential jurors remained. Only two prospective jurors required court-supplied equipment in order to participate; one accepted a tablet and one refused a device, which required that individual's juror service to be rescheduled. The juror yield for pools summoned beginning on September 21, 2020 was comparable to the Bergen Vicinage's February 2020 yield.

Defense counsel attacked the hybrid process, claiming a lack of transparency and of juror demographic data; the purportedly unclear standards with which prospective jurors were excused and deferred; and the possibility that prospective jurors who were older, of modest means, and/or lacking in technological access were disproportionately excluded. The trial court rejected defendant's contentions both as time-barred under Rule 1:8-3(b) and on the merits, opining that the pre- and post-pandemic selection processes were substantially similar, and that defendant's arguments were "based on nothing more than conjecture and innuendo spun from inaccurate information and rumors."

After the Appellate Division affirmed, defendant was convicted of and sentenced for resisting arrest/eluding, terroristic threats, attempted aggravated arson, and attempted aggravated assault. The Court granted direct certification "limited to defendant's challenge to the hybrid virtual/in-person jury selection procedure." 246 N.J. 212 (2021).

**HELD:**      *The pre-voir dire disqualification, excusal, or deferral of jurors is not a stage at which defendant is entitled to be present or be represented, and defendant has failed to support his representative-cross-section claim.

          *In recognition of the important issues raised, but not nearly substantiated, in this appeal and to better assist New Jersey courts in preventing potential underrepresentation and irregularities stemming from the hybrid process and other facially neutral selection procedures, the Court directs the AOC to begin collecting jurors' demographic information.

2

1. The trial court correctly determined that defendant's filed challenge was untimely. Rule 1:8-3(b) directs that "[a] challenge to the array shall be decided before any individual juror is examined." Relaxation of that time-bar is granted only upon a prima facie showing of actual prejudice to defendant's right to a fair and impartial jury. Here, defendant waited for two hours and through the questioning of thirteen prospective jurors before filing his challenge, and counsel's reliance on notice of a likely challenge to the jury pool is unpersuasive. Further, defendant does not set forth a prima facie claim of actual prejudice warranting relaxation of Rule 1:8-3(b)'s time-bar. (pp. 17-19)

2. Defendant argues that he was deprived of his constitutional rights to be present and represented by counsel during the pre-voir dire disqualification, excusal, and deferral of jurors. A defendant's right to be present at trial and during critical stages of the adversarial process is guaranteed by the Sixth Amendment and by Article I, Paragraph 10 of the State Constitution. Reviewing the statutes that set the criteria for disqualifying jurors and that repose discretion for excusals or deferrals in the assignment judges or their designees, the Court notes that the process employed here was substantially the same as the pre-pandemic process. (pp. 19-21)

3. Federal circuit courts have concluded that routine administrative procedures such as the statutory disqualification, excusal, or deferral of prospective jurors are not part of the true jury impanelment process and thus not a critical stage of the trial during which the parties and counsel must be present. The Court agrees. Defendant fails to provide a persuasive reason why he was entitled to be present and represented during the process of statutory qualification, excusal, and deferral set in place long prior to the pandemic. Further, defendant fails to articulate what vital information he and counsel may have gleaned from participation, given that disqualifications, excusals, and deferrals precede the revelation of any case-specific information. Nor does the Court see why an excusal based on COVID-19 should be distinguished from one based on -- for example -- impending surgery. The Court joins courts from other states in concluding that the pre-voir dire process of disqualifying, excusing, and deferring prospective jurors is not a stage at which defendants and counsel are entitled to be present. (pp. 21-24)

4. In State v. Vega-Larregui, the Court considered whether the right to a fair grand jury is violated by a virtual format allegedly limiting the participation of racial minorities, older citizens, and those of modest means. See 246 N.J. 94, 117 (2021). The Court rejected the defendant's representative-cross-section claim, citing a lack of substantiation, similar pre- and post-pandemic practices, and attestation that the number of potential grand jurors available was "not significantly different" than pre-pandemic. Id. at 127-28. The Court also concluded that the virtual process likely increased the participation of members of vulnerable demographic groups. Id. at 129. Here, the processes challenged -- pre-voir dire excusals and deferrals -- were in place pre-pandemic, and defendant's opposition to the hybrid selection process is actually a challenge to long-standing procedures now presented through the "prism" of the COVID-19 crisis. (pp. 24-26)

3

5.  A criminal defendant's right to be fairly tried by an impartial jury is protected by both the Federal and the State Constitutions.  Under the latter, defendants have "the right to trial by a jury drawn from a representative cross-section of the community."  State v. Andujar, ___ N.J. ___, ___ (2021) (slip op. at 26-27).  To challenge whether a jury pool was drawn from a representative cross-section of the community, a defendant is required to "(1) identify a constitutionally-cognizable group . . . ; (2) prove substantial underrepresentation over a significant period of time; and (3) show discriminatory purpose."  State v. Dixon, 125 N.J. 223, 232 (1991).  (pp. 26-30)

6.  Defendant asserts that, because nationwide COVID-19 statistics show disproportionate transmission rates and serious complications among minority populations, the disparity must have manifested itself in a skewed jury pool.  The argument is analogous to one rejected in State v. Coyle, 119 N.J. 194, 213 (1990).  One's likelihood of contracting and falling seriously ill due to COVID-19 may have correlative ties with race and ethnicity worthy of consideration, but it does not follow that those particularly susceptible to, or who have contracted, COVID-19 themselves make up a cognizable class under a representative-cross-section analysis.  As to technology-based arguments, the Court rejected in Vega-Larregui a similar unsupported contention, noting -- as was the case here -- that prospective jurors were provided the equipment necessary to participate.  246 N.J. at 127-29.  Defendant has failed to make a showing that any cognizable group -- however identified or classified -- has been excluded from the jury venire in this case, and the Court therefore does not reach the question of whether age or financial means, for example, might be a cognizable group for purposes of a challenge to a jury venire.  Second, defendant failed to demonstrate substantial underrepresentation over a significant period of time.  Third and finally, the jury-selection procedure employed here was facially neutral and defendant has not shown that it was applied in a discriminatory manner.  Defendant fails to meet the requirements of Dixon.  (pp. 30-35)

7.  The validity of a jury-selection process is not static, and the exercise of special care in unusual circumstances is of the utmost importance.  Defendant contends that excusal and deferral records have not been maintained as required by N.J.S.A. 2B:20-9(b) -- a claim that cannot be substantiated as such records were never requested.  Suffice it to say, those records should be kept.  Further, in recognition of the important issues raised, but not nearly substantiated, in this appeal and to better assist New Jersey courts in preventing potential underrepresentation and irregularities stemming from the hybrid process and other facially neutral selection procedures, the Court directs the AOC to begin collecting jurors' demographic information.  Disclosure should be voluntary and cover a juror's identified racial identity, ethnicity, and gender categories.  (pp. 35-36)

**AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON's opinion.**

# SUPREME COURT OF NEW JERSEY
## A-56 September Term 2020
### 085665

State of New Jersey,

Plaintiff-Respondent,

v.

Wildemar A. Dangcil,

Defendant-Appellant.

On appeal from the
Superior Court, Law Division, Bergen County.

| Argued | Decided |
|--------|---------|
| June 29, 2021 | August 16, 2021 |

Brian J. Neary argued the cause for appellant (Brian J. Neary, of counsel and on the briefs, and Lois De Julio, on the briefs.)

Jaimee M. Chasmer, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; Jaimee M. Chasmer, of counsel and on the briefs).

Joseph E. Krakora, Public Defender, argued the cause for amici curiae Public Defender of New Jersey and American Civil Liberties Union of New Jersey (Joseph E. Krakora, Public Defender, and American Civil Liberties Union of New Jersey Foundation, attorneys; Joseph J. Russo, Deputy Public Defender, Alison Perrone, First Assistant Deputy Public Defender, John P. Flynn,

1

Assistant Deputy Public Defender, Jeanne LoCicero, and Alexander Shalom, on the brief).

Lawrence S. Lustberg argued the cause for amicus curiae New Jersey State Bar Association (Gibbons and New Jersey State Bar Association, attorneys; Lawrence S. Lustberg, Michael R. Noveck, and Domenick Carmagnola, President, New Jersey State Bar Association, on the brief).

Marissa Koblitz Kingman argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Fox Rothschild, attorneys; Matthew S. Adams, of counsel and on the brief, and Marissa Koblitz Kingman and Arrianna T. Diamantis, on the brief).

Lila B. Leonard, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Andrew Bruck, Acting Attorney General, attorney; Lila B. Leonard, of counsel and on the brief, and Valeria Dominguez, Mercedes Robertson, Jeffrey Olsen, and Jesse Magliulo, Deputy Attorneys General, on the brief).

Linda A. Shashoua, Special Deputy Attorney General/Acting Assistant Camden County Prosecutor, argued the cause for amicus curiae County Prosecutors Association of New Jersey (Esther Suarez, President, County Prosecutors Association, attorney; Linda A. Shashoua, of counsel and on the brief).

JUSTICE SOLOMON delivered the opinion of the Court.

Defendant Wildemar A. Dangcil was awaiting trial when the COVID-19 pandemic hit and altered how we live, work, and conduct criminal trials. Defendant's trial was adjourned for five months and, in the interim, the

Judiciary implemented a primarily virtual, hybrid jury-selection process with the aim of balancing public health and defendants' constitutional rights, while preserving the majority of pre-pandemic practices and procedures.

Defendant's trial was Bergen County's first to utilize the hybrid process. During the virtual phase of jury selection, defense counsel filed an Order to Show Cause challenging the array as not being drawn from a representative cross-section of the community. The trial court rejected the challenge. After the Appellate Division affirmed and remanded for resumption of the trial, defendant was convicted of multiple offenses, including attempted aggravated arson. He was sentenced to an aggregate eighteen-year term of imprisonment.

We granted direct certification, and before us defendant contends that the hybrid jury-selection process deprived him of his rights to presence and representation and failed to ensure him a jury drawn from a representative cross-section of the community. Though the challenge is to the new hybrid process, it is also directed at pre-pandemic practices -- most notably pre-voir dire juror excusals and deferrals -- that have remained largely unchanged during the COVID-19 crisis.

We are asked to consider those longstanding practices through the new "prism" of COVID-19. We hold that the pre-voir dire disqualification, excusal, or deferral of jurors is not a stage at which defendant is entitled to be

3

present or be represented and that defendant has failed to support his representative-cross-section claim. We therefore affirm.

I.

A.

Following a domestic incident not relevant to this appeal, defendant was charged in an August 2019 Bergen County indictment with second-degree resisting arrest/eluding, contrary to N.J.S.A. 2C:29-2(b); fourth-degree contempt for violating an order entered under the Prevention of Domestic Violence Act of 1991, contrary to N.J.S.A. 2C:29-9(b); third-degree terroristic threats, contrary to N.J.S.A 2C:12-3(a); second-degree attempted aggravated arson, contrary to N.J.S.A. 2C:5-1(a)(1) and N.J.S.A. 2C:17-1(a)(1); and first-degree attempted murder, contrary to N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3.

Jury selection for defendant's trial was scheduled for April 20, 2020, but this Court suspended new jury selections and trials on March 12, 2020 in response to the COVID-19 pandemic. See Sup. Ct. of N.J., Notice -- COVID-19 Coronavirus -- Status of Court Operation -- Immediate and Upcoming Plans, at 1 (Mar. 12, 2020). Defendant's case was adjourned until the resumption of jury trials.

On July 22, 2020, this Court established a plan to resume criminal and civil jury selections using a hybrid process intended to "maintain[] the core

components of pre-pandemic jury operations . . . modified to protect the health and safety of jurors, attorneys, parties, and all court users."  Sup. Ct. of N.J., Order -- Resuming Criminal and Civil Jury Trials, at 1-2 (July 22, 2020). Under the predominately virtual selection process, jurors were to be summoned consistent with pre-pandemic practices, except that they were to receive a summons notice informing them of both the virtual jury-selection process and socially distanced trials.  Id. at 4.  Prospective jurors also received a COVID-19 questionnaire.  Ibid.  Court administration and assignment judges were tasked with prescreening jurors for technological access and knowledge, and with providing devices and broadband access as necessary.  Id. at 2-3.

Judiciary staff prescreened jurors for trial availability, medical inability, and other considerations consistent with pre-pandemic protocols, with COVID-19 concerns "not related to substantiated medical inability" brought before a judge and all case-specific questioning conducted during virtual voir dire before a judge, counsel, and the parties.  Id. at 4-5.  Following virtual voir dire, a fraction of prospective jurors reported in person to courts for the final phase of selection with facemask and social-distancing precautions observed. Id. at 2, 5.  The plan was produced in coordination with the Judiciary's Post-Pandemic Stakeholder Coordinating Committee, which included representatives from the Attorney General's Office, Office of the Public

Defender (OPD), County Prosecutors Association of New Jersey (CPA), and New Jersey State Bar Association (NJSBA).  Sup. Ct. of N.J., <u>Notice -- Resuming Criminal and Civil Jury Trials</u>, at 3 (July 22, 2020).

Additional guidance was provided several weeks later, specifying that jurors who did not meet the disqualification criteria of N.J.S.A. 2B:20-1 or were seeking excusal under N.J.S.A. 2B:20-10 were required to contact the Jury Management Office and supply substantiating documentation.  Sup. Ct. of N.J., <u>Notice -- COVID-19 -- Update on Resumption of Criminal and Civil Jury Trials; Next Steps</u>, at 1-2 (Sept. 11, 2020).  Jurors were contacted regarding the virtual format and related safety precautions and advised that they needed to submit a note from a healthcare provider to substantiate claims of medical inability to report.  <u>Id.</u> at 2.  Jurors were also prescreened for technological capability, including familiarity with virtual conferencing platforms, access to a private internet connection, and possession of a device with a functioning web camera, speaker, and microphone.  <u>Id.</u> at 2-3.  The Judiciary provided tablets and broadband to prospective jurors as necessary.  <u>Id.</u> at 3.  New Jersey's first jury trial was set to begin in Bergen County on September 21, 2020.  <u>Ibid.</u>

Defendant's trial was selected as the first to be conducted in Bergen County. During pretrial conferences on September 16 and 18, defense counsel advised that defendant intended to challenge the hybrid jury-selection process, but no such challenge was filed. Finally, on the morning of September 21 -- after thirteen prospective jurors were interviewed over the course of two hours -- defense counsel filed an Order to Show Cause challenging the array and sought a stay. A hearing was scheduled for September 28, but selection continued over four days with 178 prospective jurors interviewed and sixty-three selected for in-person questioning to be conducted on September 29.

In advance of the hearing, Brian McLaughlin, manager of jury programs for the Administrative Office of the Courts (AOC), and Lourdes Figueroa, jury manager for the Bergen Vicinage, presented certifications. McLaughlin attested that the same Jury Management System used to generate jury pools and send out summonses and questionnaires pre-pandemic was used in the hybrid process with three exceptions: (1) juror summons documents were modified to inform jurors of the virtual format and related requirements, (2) the juror self-deferral option[1] was temporarily disabled -- requiring prospective

---

[1] Typically, jurors are able to reschedule their own service via New Jersey's Juror eResponse Portal by opting to "Defer Service" and selecting a specific future date, provided that they do so more than a week prior to their reporting

jurors to contact Jury Management to request deferrals, and (3) additional standardized COVID-19-related communications were sent to jurors, including a COVID-19 questionnaire. In keeping with pre-pandemic practices, jury managers addressed requests for disqualification, excusals, and deferrals in a standardized pre-screening process that did not include trial-specific information such as familiarity with the parties or counsel. McLaughlin reported that, also consistent with pre-pandemic practices, juror demographic information including race, ethnicity, and gender was not collected.

Regarding defendant's case, Figueroa certified that 800 jurors were summoned. Of that list, 197 did not respond or complete the summons, 70 summonses were returned as "undeliverable," 178 prospective jurors substantiated that they did not qualify for service under N.J.S.A. 2B:20-1, 90 were excused based on substantiated N.J.S.A. 2B:20-10 factors, and 58 were deferred due to calendar conflicts; in the end, 207 potential jurors remained. Only two prospective jurors required court-supplied equipment in order to participate; one accepted a tablet and one refused a device, which required that individual's juror service to be rescheduled. A spreadsheet memorializing all 232 responses to the COVID-19 questionnaire, including duplicates, was

---

date. See Frequently Asked Questions About Juror Service in New Jersey, at 7, https://www.njcourts.gov/jurors/assets/juryfaq.pdf.

provided to the trial court in advance of selection. The juror yield -- the number of qualified responsive jurors divided by summonses issued -- for pools summoned beginning on September 21, 2020 was 22.38%, according to Figueroa, comparable to the Bergen Vicinage's February 2020 yield of 28.37%.[2]

During the hearing, defense counsel sought to question Figueroa and attacked the hybrid process based on a claimed lack of transparency and lack of juror demographic data; the purportedly unclear standards with which prospective jurors were excused and deferred; and the possibility that prospective jurors who were older, of modest means, and/or lacking in technological access were disproportionately excluded. Counsel acknowledged that prospective juror demographic data had never been collected or shared in the past, but noted that the hybrid process itself was

---

[2]  Juror-yield data provided to the Court by the AOC for February 2020, September 2020, and June 2021 differs from the figures in the record. Additionally, Bergen County's yield rate surpassed the state rate in each month -- 32.95% to 27.27% in February 2020, 27.97% to 13.24% in September 2020 with only three counties reporting, and 29.90% to 23.73% in June 2021. In limited instances, juror-yield rates have increased from February 2020 to June 2021, most notably in Camden County where the rate has moved up by nearly a percentage point -- 33.02% to 33.82%. This data does not detail the representativeness of these juror pools, but it supports the general proposition that although Bergen County's yield has decreased by several percentage points under the hybrid model, those yields still exceed the pre-pandemic statewide average.

new, stating, "I'm not saying that the process was defective. . . . All we know is that we got a certification from Ms. Figueroa, and I believe a certification from counsel, saying this is what happened. I don't know that for certain. I don't know what went into those numbers."

The trial court rejected defendant's contentions both as time-barred under Rule 1:8-3(b) and on the merits, opining that the pre-pandemic and post-pandemic selection processes were substantially similar, and that defendant's arguments were "based on nothing more than conjecture and innuendo spun from inaccurate information and rumors." The court noted that prospective jurors were provided with technological equipment and access as necessary, that jury managers had not made determinations previously addressed by judges on the record, that the demographic information sought by defendant had never been collected, and that -- far from secret -- details concerning the hybrid plan had been made public months in advance. The court reported that technological issues were infrequent and readily addressed to ensure that each prospective juror was able to participate. As for the demographic makeup of the pool, the trial court stated

> I have not heard a word from defense counsel about the demographic makeup of the jurors that we interviewed during the virtual phase of jury selection in this case. We didn't hear it, because there isn't a basis for objection. It would have been entirely without merit. The jurors we interviewed most certainly represented a

10

cross-section of the community and, based on our experience in this case so far, the hybrid jury selection process implemented by the Supreme Court will be a success.

Defendant's application was denied in its entirety along with his request to stay proceedings. The Appellate Division granted defendant's emergent application claiming that the hybrid process lacked transparency and failed to ensure a jury pool drawn from a representative cross-section of the community, affirmed the trial court's denial, and remanded for resumption of the trial. The Appellate Division agreed that defendant's challenge was untimely under Rule 1:8-3(b) and that he had failed to show actual prejudice permitting relaxation of the time bar. On the merits, the Appellate Division concluded that defendant failed to rebut the presumption that jury selection was valid and produced no evidence that the selection was non-random or excluded any constitutionally cognizable group.

We denied defendant's motion for emergent relief pursuant to Rule 2:9-8 without prejudice to defendant's right to file a post-trial motion for direct certification. Defendant's trial resumed on October 19, and he was convicted on October 23 of second-degree resisting arrest/eluding, third-degree terroristic threats, second-degree attempted aggravated arson, and third-degree attempted aggravated assault, contrary to N.J.S.A. 2C:12-1(b)(2), as a lesser-included offense to attempted murder.

11

Defendant, again, sought emergent relief under Rule 2:9-8 and we, again, denied without prejudice to defendant's right to file a motion for direct certification following entry of a judgment of conviction. In March of this year, defendant was sentenced to an aggregate eighteen-year term, with nine years -- those attributable to defendant's attempted-aggravated-arson conviction -- subject to the No Early Release Act, N.J.S.A. 2C:43-7.2(c).

Defendant thereafter filed a motion for direct certification pursuant to Rule 2:12-2. We granted certification "limited to defendant's challenge to the hybrid virtual/in-person jury selection procedure." 246 N.J. 212 (2021). We also granted leave to participate as amici curiae to the Attorney General, CPA, NJSBA, OPD, American Civil Liberties Union of New Jersey (ACLU), and Association of Criminal Defense Lawyers of New Jersey (ACDL).

## II.

### A.

#### 1.

Defendant contends that the pool from which the jury for his case was selected likely did not represent a cross-section of the community because of the disproportionate effects COVID-19 has had on racial and ethnic minorities and women. He points to Centers for Disease Control and Prevention (CDC) data showing that Black and Hispanic Americans have been significantly more

likely to contract, require hospitalization for, and die from COVID-19 than Caucasian populations as evidence that it was "probable" that a disproportionately low number of Black and Hispanic Americans were available for jury service in his trial. Similarly, defendant cites a study detailing how women have disproportionately borne additional childcare demands during the pandemic, presumably impacting the ability of women to serve on juries.

Defendant acknowledges that he is unable to demonstrate an actual lack of representation, but attributes that inability to Jury Management's failure to maintain demographic records, the denial of his discovery request, and the absence of trial counsel during the excusal process. To the latter point, defendant further argues that the processing of hardship excusals and deferrals outside his and counsel's presence denied him of both his Sixth Amendment right to counsel during a critical stage of his proceedings and his own constitutional right to be present at all stages of his trial -- including jury empanelment.

2.

Amici curiae NJSBA, ACDL, OPD, and ACLU all support defendant's general position. The NJSBA asserts that juror excusals and deferrals outside the presence of defendant and counsel infringed on defendant's right to

13

participate and deprived defense counsel of a valuable opportunity to assess jurors. It adds that temporarily disabling the self-deferral option provided Jury Management with additional discretion with respect to deferrals -- the scope of which cannot be ascertained because records are not maintained.

The ACDL asserts that the hybrid process places an additional requirement on prospective jurors -- reliable internet access -- that cannot be satisfied simply by providing devices and broadband and that inadequately accounts for COVID-19's disparate impact on older and minority populations. The ACDL adds that the hybrid process should be used only upon the informed consent and knowing waiver of a defendant and argues that defendant is entitled to juror data and that, if none exists, the trial court must restart the process and collect such data.

The OPD and ACLU, in their joint appellate brief, advance two proposed safeguards: having judges rule on all COVID-19-related excusals and requiring the collection of prospective juror demographic information. [3]

---

[3] The ACDL, OPD, and ACLU also assert that the Attorney General's representation of the AOC is a conflict of interest, an issue not raised by the parties and therefore not considered by the Court. See State v. O'Driscoll, 215 N.J. 461, 479-80 (2013) ("[A]s a general rule, an amicus curiae must accept the case before the court as presented by the parties and cannot raise issues not raised by the parties." (alteration in original) (quoting State v. Lazo, 209 N.J. 9, 25 (2012))).

14

B.

1.

The State counters that defendant relies only on the "likely" disproportionate effect of COVID-19 on minority and female prospective jurors -- a position the State characterizes as contrary to the observations of the trial court, the prosecutor, and even defense counsel during the Order to Show Cause hearing. The State adds that defendant's argument that he had a right to be present and represented during excusals and deferrals should both be deemed waived for failure to raise the objection below[4] and rejected in the same manner that numerous other jurisdictions have declined to recognize a right to presence and representation during the production of a jury venire.

2.

The Attorney General and CPA echo the State's arguments and each other's. With respect to defendant's representative-cross-section challenge,

---

[4] "Generally, an appellate court will not consider issues, even constitutional ones, which were not raised below," State v. Galicia, 210 N.J. 364, 383 (2012), however "the limitation on the scope of appellate review is not absolute," State v. Robinson, 200 N.J. 1, 20 (2009). If "[t]he issue is an important one of public concern and ought be considered; there is no question as to our power to do so." City of Newark v. Pulverman, 12 N.J. 105, 108 (1953); see also Brown v. Shaw, 174 N.J. Super. 32, 39 (App. Div. 1980). We acknowledge the importance of a defendant's right to presence and representation and thus choose to address the issue on the merits.

15

the Attorney General rebuts defendant's claim of underrepresentation due to technological access by noting that the hybrid plan provides prospective jurors with necessary equipment. Defendant is unable to demonstrate that any disparity stemming from hardship excusals and deferrals was unreasonable over a sufficient period of time or the result of systematic efforts to exclude cognizable populations, according to the Attorney General. The CPA concurs, finding defendant's representative-cross-section claim to be speculative and reliance on CDC data lacking in any causal tie between minority COVID-19 rates and substantiated grounds for excusal.

As for defendant's argument that he had a right to be present and represented during excusals and deferrals, the Attorney General submits that defendant waived the argument below. With regard to the merits of the claim, such excusals -- made under set statutory criteria -- are administrative and have been handled by assignment judges and designees pre- and post-pandemic. The CPA adds that a defendant's right to be present is not absolute, excusals are generally granted or denied prior to any disclosure of case-specific information, and the hybrid plan's removal of the self-deferral option likely increased -- rather than decreased -- the number of prospective jurors.

III.

A.

As an initial matter, the trial court correctly determined that defendant's Order to Show Cause was untimely.  <u>Rule</u> 1:8-3(b) directs that "[a] challenge to the array shall be decided before any individual juror is examined."  <u>Accord</u> <u>State v. Butler</u>, 155 N.J. Super. 270, 271 (App. Div. 1978).  As this Court has explained, relaxation of <u>Rule</u> 1:8-3(b)'s time bar is to "be granted only where there is a prima facie showing of actual prejudice to defendant's right to a fair and impartial jury."  <u>State v. Simon</u>, 161 N.J. 416, 481 (1999).  Otherwise, "time limitations are 'strictly enforced' because to do otherwise would 'impede the orderly administration of [the] criminal justice system.'"  <u>Ibid.</u> (alteration in original) (quoting <u>State v. Gerald</u>, 113 N.J. 40, 128 (1988)).

Here, defendant waited for two hours and through the questioning of thirteen prospective jurors before filing his Order to Show Cause.  Counsel's contention that the State and trial court were on notice of a likely challenge to the jury pool is unpersuasive.  To agree with defendant would make courts and opposing parties responsible for what a defendant <u>may</u> do, including the filing of untimely challenges.  Such a system would be ripe for abuse and no doubt impede the efficient functioning of our courts.  <u>Cf.</u> <u>H.C. Equities, LP v. County of Union</u>, ___ N.J. ___ (2021) (slip op. at 29) (rejecting an

17

interpretation of the New Jersey Tort Claims Act that "would require counsel for a public entity to review every letter, e-mail, or other communication received from counsel for a potential claimant and determine whether any such communication, when combined with other communications, might constitute notice of a tort claim"); State v. Irving, 114 N.J. 427, 433 (1989) ("The purpose of a notice of alibi is 'to avoid surprise at trial by the sudden introduction of a factual claim [that] cannot be investigated unless the trial is recessed to that end.'" (alteration in original) (quoting State v. Garvin, 44 N.J. 268, 272-73 (1965))); State v. Wyles, 462 N.J. Super. 115, 122 (App. Div. 2020) ("The reciprocal discovery provision in [Rule] 3:13-3 . . . . entitle[s] [the State] to know in advance what evidence a defendant intends to use at trial so that it may have a fair opportunity to investigate the veracity of such proof." (alterations and omission in original) (quoting State v. Williams, 80 N.J. 472, 478 (1979))).

Further, defendant does not set forth a prima facie claim of actual prejudice warranting relaxation of Rule 1:8-3(b)'s time bar. To the contrary, defense counsel specifically clarified at the Order to Show Cause hearing that he was "not saying that the process was defective." As discussed infra, we conclude that defendant's right to a fair and impartial jury was not infringed by the hybrid selection process.

18

B.

We first address defendant's claim that he was deprived of his rights to be present and represented by counsel during the pre-voir dire disqualification, excusal, and deferral of jurors. We conclude that the process of whittling down the jury pool based on statutory criteria and scheduling conflicts does not implicate a defendant's substantive rights.

A defendant's right to be present at trial is guaranteed by the Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution. State v. Tedesco, 214 N.J. 177, 189 (2013). This right is buttressed by our court rules, which state that "[t]he defendant shall be present at every stage of the trial, including the impaneling of the jury . . . , unless otherwise provided by Rule." R. 3:16(b). The Sixth Amendment similarly guarantees defendants the right to counsel during "critical stage[s]" of the adversarial process, State v. Harris, 181 N.J. 391, 440 (2004), and Article I, Paragraph 10 of our State Constitution "is 'consonant with the Federal Constitution on the issue of when the right to counsel is triggered,'" State v. A.O., 198 N.J. 69, 82 (2009) (quoting State v. P.Z., 152 N.J. 86, 110 (1997)).

We have held that jury voir dire is a stage that triggers a defendant's right to be present and to be represented by counsel. See State v. Colbert, 190

19

N.J. 14, 21 (2007) (presence); State v. McCombs, 81 N.J. 373, 377-78 (1979) (counsel). However, a defendant's right to be present "is not absolute," State v. Luna, 193 N.J. 202, 210 (2007), and the right to counsel is limited to "'critical stage[s]' of the prosecution," meaning stages "in which the substantial rights of the accused may be affected," A.O., 198 N.J. at 82.

In the context of jury selection, prospective jurors are disqualified from service by statute if they are under the age of eighteen, unable to read or understand English, or have a mental or physical disability preventing their service, among other factors. N.J.S.A. 2B:20-1. Also, qualified prospective jurors may seek to be excused if they are age seventy-five or older or if service would create a medical, financial, or similarly "severe" hardship. N.J.S.A. 2B:20-10. Upon the denial of a request to be excused, the vicinage assignment judge may direct that the prospective juror's service be deferred. N.J.S.A. 2B:20-11. Excusals and deferrals are uniquely within the discretion of assignment judges or their designees. See N.J.S.A. 2B:20-9.

The process employed here was substantially the same as that followed before the COVID-19 pandemic. Minor adjustments included the temporary disabling of the automatic-deferral option, leaving Jury Management to address such requests consistent with N.J.S.A. 2B:20-11. A COVID-19-specific questionnaire -- asking prospective jurors whether they had tested

20

positive for, or been exposed to, COVID-19 and whether they had concerns relating to COVID-19-related precautions, among other similar questions -- was also distributed as permitted by statute. See N.J.S.A. 2B:20-3(a) ("The Assignment Judge may direct that questionnaires be sent to potential jurors, requesting that they provide pertinent information concerning their qualifications for jury service, and any claims for exemption or deferral.").

Our courts have not previously considered whether the statutory disqualification, excusal, or deferral of prospective jurors by an assignment judge or designee is a stage at which a defendant is entitled to presence and representation, but federal circuit courts have concluded that such "routine administrative procedures relating to jury selection are not part of the true jury impanelment process in which parties and counsel have a right to participate." United States v. Greer, 285 F.3d 158, 167 (2d Cir. 2002); accord, e.g., United States v. Moreland, 703 F.3d 976, 982-83 (7th Cir. 2012). In Moreland, the defendants challenged the excusal of several potential jurors in advance of voir dire due to vacation plans, business commitments, and employment obligations that would have created hardships if they were selected to serve on a lengthy trial. 703 F.3d at 982. The Seventh Circuit rejected the defendants' argument that the excusals violated their right to presence under Rule 3:16(b)'s federal analogue, Fed. R. Crim. P. 43(a)(2), reasoning that excusal requests and

21

related actions preceded the jury empanelment at which defendants had a right to be present and that it was "difficult to see what the defendant could have added" to the "general qualification of the jury." Id. at 982-83 (quoting Henderson v. Dugger, 925 F.2d 1309, 1316 (11th Cir. 1991)). Likewise, in Greer, the Second Circuit reaffirmed its prior holdings that "hardship questioning is not a part of voir dire -- and thus not a critical stage of the trial during which the parties and counsel must be present." 285 F.3d at 167-68 (reviewing cases).

We find that the same principles hold true here. Defendant fails to provide a persuasive reason why he was entitled to be present and represented during the process of statutory qualification, excusal, and deferral set in place long prior to the pandemic. Indeed, it is difficult to envision how defendant and counsel could have meaningfully participated in a process in which jurors were removed based on substantiated hardships, scheduling conflicts, and similar considerations. Further, defendant fails to articulate what vital information he and counsel may have gleaned from participation, given that disqualifications, excusals, and deferrals precede the revelation of any case-specific information. To recognize this process as a critical stage would require the participation of countless sets of parties and counsel on the off chance that one of the prospective jurors will be directed to a particular case.

22

Alternatively, defendant and amici suggest that the importance of the stage may depend on whether the excusal or deferral is related to COVID-19. But basing a right on the unknowable answer of a prospective juror creates a litany of practical complications, and we strain to see why an excusal based on -- for example -- impending surgery would be less constitutionally significant than an excusal due to having recently contracted COVID-19. See Moreland, 703 F.3d at 983 (deciding that "[p]racticality dictates" finding that the excusal process precedes jury empanelment).

We therefore decline defendant's invitation to recognize a new critical stage in the prosecution of a criminal defendant. Rather, we join sister courts in other states in expressly concluding that the pre-voir dire process of disqualifying, excusing, and deferring prospective jurors is not a stage at which defendants and counsel are entitled to be present. See Orme v. State, 896 So. 2d 725, 737 (Fla. 2005); Commonwealth v. Barnoski, 638 N.E. 2d 9, 13-14 (Mass. 1994); Davis v. State, 767 So. 2d 986, 992 (Miss. 2000); State v. Sanders, 13 P.3d 460, 467-68 (N.M. 2000); State v. Hyde, 530 S.E. 2d 281, 291-92 (N.C. 2000).

Having determined that defendant and counsel were not entitled to be present during the excusal and deferral process, we turn to defendant's final

23

contention:  that the hybrid selection process nonetheless failed to ensure a jury drawn from a representative cross-section of the community.

C.

1.

Earlier this year we had occasion to consider an issue similar to the one before us:  whether a criminal defendant's right to a fair grand jury is violated by a virtual format allegedly limiting the participation of racial minorities, older citizens, and those of modest means.  See State v. Vega-Larregui, 246 N.J. 94, 117 (2021).  In Vega-Larregui, as in this appeal, certifications were submitted from statewide and county officials stating that the grand-jury process had "remained largely unchanged," with disqualifications, excusals, and reschedulings handled in the same standardized manner as they had been before, and with the Judiciary providing technological equipment and training to prospective jurors to facilitate full participation.  Id. at 109-10.  We rejected the defendant's representative-cross-section claim, citing a lack of substantiation, markedly similar pre- and post-pandemic practices, and attestation that the number of potential jurors available for virtual grand juries was "not significantly different" than were available pre-pandemic.  Id. at 127-28.  To the contrary, we concluded that the virtual process likely increased --

24

rather than decreased -- the participation of members of vulnerable demographic groups.  Id. at 129.

We recognize here the limited applicability of Vega-Larregui -- most notably the fact that the defendant's grand jury was selected pre-pandemic -- to our case, but we are nonetheless informed by our discussion there.

We also find that the specific processes challenged here -- pre-voir dire excusals and deferrals -- were in place pre-pandemic and that defendant's opposition to the hybrid selection process is actually a challenge to long-standing procedures now presented through the "prism" of the COVID-19 health crisis.  The certifications from McLaughlin and Figueroa and our own directives evidence that jurors were/are selected through the hybrid process in substantially the same way that they were selected pre-pandemic, save for modified summons documents, disabled juror self-deferral, and additional standardized communications including the COVID-19 questionnaire.  Jurors were required to appear before a judge or designee before being excused or deferred for COVID-19 concerns "not related to substantiated medical inability," see Order -- Resuming Criminal and Civil Jury Trials, at 5, and Judiciary staff prescreened prospective jurors for technological capabilities and provided equipment as necessary to ensure full participation.  We note that

25

amici NJSBA and OPD were among the stakeholders whose input was elicited in crafting those adaptations.

To compare the practical effects of those adjusted practices, defendant relies largely on general CDC data that is not specific to New Jersey, let alone Bergen County, and juror-yield statistics for only Bergen County -- and for only February 2020 and part of September 2020. Those statistics, as detailed, differ by just a few percentage points and do not reveal the over- or underrepresentation of any specific group.

It is with that guidance and having recognized those limitations that we proceed to consider defendant's representative-cross-section claim.

2.

A criminal defendant's "constitutional right to be fairly tried by an impartial jury" is protected by both the Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution. State v. Little, 246 N.J. 402, 414 (2021) (quoting State v. Williams, 93 N.J. 39, 61 (1983)). That right under Article I, Paragraph 10 of the State Constitution, in conjunction with Paragraphs 5 and 9, guarantees "defendants 'the right to trial by a jury drawn from a representative cross-section of the community.'" State v. Andujar, ___ N.J. ___, ___ (2021) (slip op. at 26-27) (quoting State v.

26

Gilmore, 103 N.J. 508, 524 (1986));[5] see also Taylor v. Louisiana, 419 U.S. 522, 528 (1975) ("[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial."). Thus, "in all criminal prosecutions the defendant is entitled to trial by an impartial jury without discrimination on the basis of religious principles, race, color, ancestry, national origin, or sex." Gilmore, 103 N.J. at 524. The representative-cross-section requirement "appl[ies] both to the initial selection of the venire and to the selection of the petit jury from the venire." State v. Fuller, 182 N.J. 174, 195 (2004).

Jury-selection processes are presumed valid and a defendant challenging a jury-selection process "must show by a preponderance of the believable evidence that the attacked process is fatally flawed." State v. Long, 204 N.J. Super. 469, 485 (Law Div. 1985). To challenge whether a jury pool was drawn from a representative cross-section of the community, a defendant is required to

> (1) identify a constitutionally-cognizable group, that is, a group capable of being singled out for discriminatory treatment; (2) prove substantial underrepresentation over a significant period of time; and (3) show

---

[5] Following oral argument, defendant and the NJSBA filed submissions under Rule 2:6-11(d), citing Andujar as support for their contentions. Andujar involved a specific prospective juror at a distinct stage of jury selection, and we therefore find our decision there to be largely inapplicable to the case at bar.

27

discriminatory purpose either by the strength of his statistical showing or by showing the use of racially non-neutral selection procedures to support the inference of discrimination raised by substantial underrepresentation.

[State v. Dixon, 125 N.J. 223, 232 (1991).][6]

If a defendant establishes all three prongs, the burden then shifts to the State, which must show "that a significant state interest is manifestly and primarily advanced by those aspects of the jury selection process that result in disproportionate exclusion of the distinctive group." State v. Ramseur, 106 N.J. 123, 216-17 (1987).

---

[6] Dixon cited State v. Ramseur, 106 N.J. 123 (1987), for the proposition that a defendant's burden is the same under both a representative-cross-section and equal-protection claim. See Dixon, 125 N.J. at 232. Ramseur, however, actually bifurcated the second and third prongs of the analyses based on United States Supreme Court cases that appeared to suggest that an equal-protection claim required a greater showing than a Sixth Amendment representative-cross-section claim. See 106 N.J. 215-16. We interpret Dixon to confirm that, despite the subtle apparent differences, the two claims require identical showings and are to be treated as congruous. In considering defendant's representative-cross-section claim, therefore, we rely on the more recent, stringent standard of Dixon, which shares important characteristics with the United States Supreme Court's more recent articulation of the relevant standard. See Berghuis v. Smith, 559 U.S. 314, 327 (2010) ("To establish a prima facie violation of the fair-cross-section requirement, . . . a defendant must prove that: (1) a group qualifying as 'distinctive' (2) is not fairly and reasonably represented in jury venires, and (3) 'systematic exclusion' in the jury-selection process accounts for the underrepresentation." (quoting Duren v. Missouri, 439 U.S. 357, 364 (1979))).

28

Our rules and statutes pertaining to jury selection "are designed to pursue the goal of producing a jury in each case that is 'as nearly impartial as the lot of humanity will admit.'" State v. Tinnes, 379 N.J. Super. 179, 183 (App. Div. 2005) (quoting Williams, 93 N.J. at 60). The objective is to "produce a pool of jurors that truly reflect community standards and in which all have an equal chance of serving." Long, 204 N.J. Super. at 485 (footnote omitted).

"Equal chance" is the operative phrase because the representative-cross-section requirement does not guarantee proportional representation of each demographic group within a community. Fuller, 182 N.J. at 195. The representative-cross-section requirement serves to "make[] possible a diversity of perspectives that fosters an 'overall impartiality of the deliberative process,'" ibid. (emphasis added) (quoting Gilmore, 103 N.J. at 525), "not to guarantee proportional representation of every diverse group on every jury, let alone to mandate disproportional representation by setting aside a spot for every discrete group on every jury," Gilmore, 103 N.J. at 525; see also Ramseur, 106 N.J. at 216 ("[A] defendant has no right to a jury that includes members of his own race."). At the same time, however, "[t]he fair cross-section principle . . . is designed to achieve results, not just assure opportunities; thus '"compilers of jury lists may drift into discrimination by

29

not taking affirmative action to prevent it.""" Ramseur, 106 N.J. at 227 (quoting People v. Harris, 679 P.2d 433, 446 (Cal. 1984)).

3.

Having identified the hurdle standing between defendant and the relief he seeks, we conclude that he fails to clear it. We analyze the facts and considerations before us under Dixon in the interest of providing guidance for future challenges.

First, with respect to identifying a constitutionally cognizable group, we have found such groups to "at minimum . . . include those defined on the basis of religious principles, race, color, ancestry, national origin, and sex." Gilmore, 103 N.J. at 526 n.3; see also State v. Bellamy, 260 N.J. Super. 449, 456-57 (App. Div. 1992) ("[T]o be classified as cognizable under Gilmore, a group must be one that has been historically excluded, on the basis of stereotypical prejudices, from full participation in the significant duties and privileges of American citizenship." (synthesizing guidance from Gilmore and City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985))).

We note at the outset that -- contrary to prior similar challenges -- defendant here provides no useful data for us to consider. Rather he asserts that, because nationwide COVID-19 statistics show disproportionate transmission rates and serious complications among minority populations, the

30

disparity must have manifested itself in a skewed jury pool. The argument is analogous to one we rejected in State v. Coyle, in which the defendant argued that two municipalities were underrepresented in three jury panels. See 119 N.J. 194, 213 (1990). We determined that the defendant's argument was not, in fact, that members of a cognizable group were excluded. Id. at 213-14. One's likelihood of contracting and falling seriously ill due to COVID-19 may, similar to the municipality in which they live, have correlative ties with race and ethnicity worthy of consideration, but it does not follow that those particularly susceptible to, or who have contracted, COVID-19 themselves make up a cognizable class under a representative-cross-section analysis.

As to technology-based arguments, we rejected in Vega-Larregui a similar unsupported contention that the virtual process led inexorably to an unrepresentative jury pool, noting -- as was the case here -- that prospective jurors were provided the equipment necessary to participate. 246 N.J. at 127-29; see also Weeks v. State, 396 S.W.3d 737, 742-45 (Tex. App. 2013) (dismissing the defendant's challenge to an "e-juror" selection process). Age-based groups have not been recognized as constitutionally cognizable by either the Appellate Division, see Bellamy, 260 N.J. Super. at 456-57, or federal courts, see, e.g., Silagy v. Peters, 905 F.2d 986, 1010-11 (7th Cir. 1990) (declining to adopt the petitioner's position that individuals over the age of

31

seventy represent a cognizable group).  Federal courts have also declined to recognize those of modest means as a cognizable group.  See United States v. Gonzalez-Velez, 466 F.3d 27, 39 (1st Cir. 2006) (finding no support for the defendant's claim that public-housing residents are a cognizable group); United States v. Kleifgen, 557 F.2d 1293, 1296 (9th Cir. 1977) ("[N]either non-high school graduates, non-working people, nor the young are cognizable classes.").  Nor have they discerned a representative-cross-section violation in the exclusion of minority jurors due to illness.  See United States v. Dunnican, 961 F.3d 859, 880 (6th Cir. 2020) (rejecting the defendant's representative-cross-section claim premised on the removal and replacement of a lone Black juror due to illness).

Importantly, defendant has failed to make a showing that any cognizable group -- however identified or classified -- has been excluded from the jury venire in this case.  Therefore, we do not have to determine here whether age or financial means, for example, might be a cognizable group for purposes of a challenge to a jury venire.

Second, even if defendant has identified a constitutionally cognizable group, he fails to demonstrate substantial underrepresentation over a significant period of time.  "[M]embers of a cognizable group, like all potential jurors, may be excused for reasons not rising to the level of removal

32

for cause." Fuller, 182 N.J. at 201. What constitutes substantial underrepresentation varies from case to case, and we have declined to adopt a particular standard for analyzing such claims. See Ramseur, 106 N.J. at 217-222. Here, defendant has provided no data for comparison other than juror-yield statistics that are comparable to Bergen County's pre-pandemic yields. Likewise, defendant is unable to demonstrate underrepresentation over a significant period of time by applying general, nationwide CDC data to his one jury pool. See Dixon, 125 N.J. at 235 (finding uncompelling a dated survey of 500 jurors, in part, because it covered an insufficient period of time); Coyle, 119 N.J. at 214 ("Whatever a significant period of time might be, it surely is not three weeks.").

Third and finally, we conclude that the jury-selection procedure employed here was facially neutral and defendant has not shown that the neutral procedure was applied in a discriminatory manner. See Coyle, 119 N.J. at 214. As has been repeatedly referenced, the hybrid process of jury selection is substantially similar to pre-pandemic practices, and defendant has failed to demonstrate that application of those same practices through the "prism" of COVID-19 amounts to discriminatory intent. See State v. Hightower, 120 N.J. 378, 401 (1990) (finding that a county's "facially neutral" practice of compiling petit-jury lists from motor-vehicle and voting records

33

rebutted the defendant's representative-cross-section and equal-protection claims). As in <u>Gerald</u>, we find that, here, "the methods used were chosen out of a commitment to improve the juror-selection process rather than an attempt to undermine or to inject invidious discrimination into it." 113 N.J. at 132; <u>see also</u> <u>Ramseur</u>, 106 N.J. at 226 (noting New Jersey's efforts toward achieving greater juror representativeness, including the addition of Department of Motor Vehicle lists in compiling jury pools).

The hybrid process was intended to balance public health and safety with the "the fundamental rights established by the United States Constitution and the New Jersey State Constitution, including meaningful participation by attorneys and parties in the jury selection process," <u>see</u> <u>Order -- Resuming Criminal and Civil Jury Trials</u>, at 2, and we find success in the similarity between pre- and post-pandemic juror yields. Facets complained of, such as removal of the automatic-deferral option, logically <u>increased</u> the size and representativeness of jury pools, and prospective jurors were doubtlessly more likely to be willing and able to participate with additional precautions like limiting the number of in-person jurors to accommodate social distancing. <u>See</u> <u>Vega-Larregui</u>, 246 N.J. at 129 (determining that virtual grand-jury procedures increased representation).

34

Because we find that defendant fails to meet the requirements of <u>Dixon</u>, we need not consider the State's interest in the hybrid selection process. We close by recognizing that the validity of a jury-selection process is not static, and the exercise of special care in unusual circumstances is of the utmost importance. Defendant, for instance, contends that excusal and deferral records have not been maintained as required by N.J.S.A. 2B:20-9(b) -- a claim that cannot be substantiated as such records were never requested by defense counsel in this case. Suffice it to say, records should be kept. Our courts, jury managers, and stakeholders must remain vigilant in the event that the facially neutral practices we approve of here result in underrepresentation of a cognizable group despite all best efforts. <u>See</u> <u>Ramseur</u>, 106 N.J. at 227 ("[J]ury officials may not sit by idly in the belief that no constitutional complaint may be lodged against a random selection mechanism" because exclusive reliance on "facially 'neutral'" approaches that nonetheless permit systematic underrepresentation can themselves "become constitutionally suspect"). Irregularities may result from imperfect application of measures aimed at improving the selection process. <u>See</u> <u>Gerald</u>, 113 N.J. at 133.

In recognition of the important issues raised, but not nearly substantiated, in this appeal and to better assist our courts in preventing potential underrepresentation and irregularities stemming from the hybrid

35

process and other facially neutral selection procedures, we direct the AOC to begin collecting jurors' demographic information.  Disclosure should be voluntary and cover a juror's identified racial identity, ethnicity, and gender categories.  "Perfection may not be attainable but its pursuit should be relentless."  Long, 204 N.J. Super. at 486.

## IV.

The judgment of the trial court is affirmed.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and PIERRE-LOUIS join in JUSTICE SOLOMON's opinion.